WILSON, J.,
FOR THE COURT:
¶ 1. Kadarius White was indicted and tried in the Hinds County Circuit Court oh four counts of armed robbery, four counts of armed carjacking, and possession of stolen property. The charges arose from five separate incidents. Following a jury trial, White was convicted of two counts of armed robbery, two counts of armed carjacking, and possession of stolen property. He was sentenced to four terms of twenty-five years and one term of ten years, all to be served concurrently in the custody of the Mississippi Department of Corrections.
■ ¶ 2. On appeal, White raises eight issues. We conclude that White is entitled to a new trial based on his first issue: a clear discovery violation by the State followed by the denial of White’s request, for a mistrial or continuance. Just prior to opening statements, the district attorney disclosed that the State possessed approximately ninety-five minutes of recorded phone conversations involving White, and the State intended to introduce unspecified parts of the recordings, including an alleged “confession,” into evidence at trial. The recordings had been in the State’s possession for two years, but despite a specific discovery request by White, the State had failed to disclose their existence. The trial judge delayed opening statements just long enough for White’s attorney to listen to the recordings but denied White’s request for a continuance or mistrial. Given the State’s clear violation of the rules of discovery and the importance of the evidence, we conclude that the denial of a continuance or mistrial was an abuse of discretion; that the error was not harmless, and that White is entitled to a new trial.
¶ 3. Since White’s first issue requires a new trial, we need not address the other grounds on which White seeks a new trial. We do address White’s speedy-trial and sufficiency-of-the-evidence arguments because these claims, if successful, would prevent further prosecution of White on some or all counts. However, White waived his statutory right to a speedy trial, and there was sufficient evidence to sustain convictions on the relevant counts, Accordingly, we reverse and remand for a new trial.
FACTS AND PROCEDURAL HISTORY
¶ 4. In August 2013, a Hinds County grand jury returned a nine-count indict *862 ment against White. The indictment alleged as follows: On April 7, 2013, White used a gun to take Scott Penman’s wallet and cell phone (Count I—armed robbery) and white Toyota Corolla (Count II— armed carjacking). On April 22, 2013, White used a gun to take Shelley Davis’s purse (Count III—armed robbery) and Jeep Cherokee (Count IV—armed carjacking). On April 22, 2013, White also used a gun to take LaQuinta Thomas’s purse (Count V—armed robbery) and Honda Civic (Count VI—armed carjacking). On April 23, 2013, White used a gun to take Destiny Taylor’s wallet and cash (Count VII—armed robbery) and Ford Fusion (Count VIII—armed carjacking). And on April 24, 2013, White possessed a Hyundai Sonata that had been stolen from Tabitha Bailey and that White knew or had reasonable grounds to know that the vehicle was stolen (Count IX—possession of stolen property).

Witness Testimony and Physical Evidence

¶ 5. At trial, Penman testified that he returned to his home in the Fondren area of Jackson around 8 p.m. on April 7, 2013. As he was still seated in his car, a man appeared next to the car, pointed a gun at him, and demanded his keys, wallet, and cell phone. Penman complied, and the man drove away in Penman’s white Toyota Corolla. Penman identified White in a photo lineup and at trial as the man who robbed him. Penman also testified that a day or two after the incident, he received an email from an “app” on his cell phone (“Lookout”) notifying him that his phone was in the vicinity of 932 or 933 Carnation Drive in Jackson.[1] Detective Melvin Williams of the Jackson Police Department (JPD) later testified that White lived at 933 Carnation Drive. Penman’s cell phone was never recovered.
¶ 6. Between 10 and 10:30 p.m. on April 22, 2013,[2] Davis drove up to the Willow Point Apartments in Jackson, where she lived at the time.[3] Davis testified that when she exited her vehicle, a man snatched her keys from her hand, pointed a gun at her face, and then snatched her purse from her. The man then left in her vehicle, a Jeep Cherokee. Davis identified White in a photo lineup and at trial as the man who robbed her.
¶ 7. Around 11:10 p.m. on April 22, 2013, Thomas drove up to the Willow Creek Apartments in Jackson, where she lived at the time.[4] Thomas testified that she parked on the street in front of the apartments, and as soon as she got out of her car, a man approached her with a gun drawn. He ordered her to put her purse and another bag back in her car, and she complied. He also took her keys. The man ordered Thomas to lie on the ground, but she ran toward her apartments instead. The man then left in Thomas’s vehicle, a Honda Civic. Thomas identified White in a photo lineup and at trial as the man who robbed her.
¶ 8. Taylor testified that around 9 or 10 p.m. on April 23, 2013, she went to visit a *863 Mend, Milton Miller, at his house on Lorenz Boulevard ih Jackson. Taylor and Miller drove to a store and then returned to his house. As they were sitting in Taylor’s car in the driveway, a man with a bandanna over his mouth appeared at the window with a gun and ordered them out of the car. After Taylor and Miller exited the car, the man’s bandanna slipped down so that Taylor could see his face. The man then drove away in Taylor’s car, a Ford Fusion. Taylor’s wallet, which contained $300, was in the backseat. Taylor identified White in a photo lineup and at trial as the man who robbed her. Detective Williams testified that White .and Devontae Stamps- were later arrested together as codefendants on a “different charge,” and Stamps had Taylor’s social security card “in his pocket or on his person.”
¶ 9. Taylor also testified that immediately after the robbery, Miller made a phone call to someone, though she did not know who, and her car was returned about forty-five minutes later. The person who returned her ear was not the person who robbed her but “[s]omebody totally different,” who she did not know. At trial, JPD witnesses identified the man who returned the car as Dewan Adams. After the State rested, Adams was called as a defense witness. He testified that when Miller called him, “I told him I ain’t know who robbed him. What I did I went and got the car.... I got the car from Vontae.” Adams testified that he did not know Vontae’s last name but only knew him in “the neighborhood by Vontae.” Adams testified that Vontae was alone when he brought Adams the car. Adams also testified that he did not know White. On cross-examination, Adams acknowledged that he later met White in jail and that White was upset that Adams’s name came up in the case.
¶ 10. Bailey testified that between midnight and 1 a.m. on April 22, 2013, she drove a friend, Courtney Younger, to the Camelot Apartment Complex on Robinson Road in west Jackson. Bailey’s daughter and Younger’s three-year-old son were also in the vehicle, a Hyundai Sonata. When Bailey and Younger exited the Sonata, “two young men” approached them with guns drawn. One of the men put his gun to Bailey’s chest, and the other put his gun to Younger’s head. The men took the women’s purses and were about to' drive away in the Sonata with Younger’s son still inside. The women begged the men to allow them to get the child out of the vehicle, and the men allowed them to do so and then drove away. Bailey could not identify either of the men, who were wearing hoods. . ..
¶ 11. JPD recovered Bailey’s car two days later after a car chase. White and Stamps were arrested after they abandoned the car and fled on foot. Detective Williams testified that Younger identified Stamps as one of the two men who had robbed her and Bailey.
¶ 12. In his closing argument, defense counsel argued that the victims had given police physical descriptions of the perpetrator(s) that did not match White. Whereas White was approximately 5’3’ and 120 pounds, the perpetrator was, according to various witnesses, between 5’6” and 6’0” and between 140 and 200 pounds. Defense counsel also argued that the witnesses had given differing descriptions of the gun(s) displayed in the various incidents, and no guns were ever recovered. Finally, defense counsel emphasized that the vehicles belonging to Penman, Thomas, Taylor, and Bailey were all recovered and some or all were tested for fingerprints and other forensic evidence, but no physical evidence linking White to those vehicles was recovered.

*864
Recordings from the Simpson County Jail-

¶ 13. In addition to the testimony of- the victims and JPD detectives and officers, the State introduced into evidence five excerpts- of recorded phone conversations placed by White from the Simpson County Jail. As noted above, White was -arrested in Jackson on April 24, 2013, but for reasons that are unclear, he was taken to the Simpson County jail shortly thereafter. Within a few days of White’s arrest, Captain Fred Williams of the Simpson County Sheriffs Department obtained recordings of phone calls placed by White from the jail to an unidentified female. Captain Williams notified JPD Detective Williams of the evidence, and Detective Williams and Detective West promptly traveled to Simpson County to retrieve the recordings. Detective Williams testified that he recognized White’s voice on the recordings, and he and Detective West recognized that the evidence was relevant and significant to their investigations of the crimes at issue in this appeal.
¶ 14. In August 2013, the grand jury indicted White, and in January 2014, White filed a motion for discovery that specifically requested “[a]ll written or recorded statements (or copies), and the substance of any oral statements, relevant in any way to the alleged crimes, made by [him].” However, the State never disclosed or produced the recordings from the Simpson County jail.
¶ 15. The case finally proceeded to trial in May 2015, more than two years after White’s arrest and approximately sixteen months after his .motion for discovery. On Monday, May 4, 2015, a jury was selected. At the end of the day, the judge told the jurors and the parties to report back ready to begin trial at 9 a.m. The next morning, just before opening statements, the district attorney announced: “This morning, Your Honor, we received a CD ... where Mr. White was recorded from the Simpson County jail speaking to. his girlfriend, and he also basically confessed to committing certain crimes in this case. The defendant did not get this because we just received [it] this morning.” In response to the judge’s questions, the district attorney admitted that although he claimed that he had “just received” the CD, it had been in Detective West’s possession for two years. Defense counsel informed the judge that the district attorney’s announcement was the “first time” he had heard about the CD, and he asked for ten or fifteen minutes to listen to it. The judge then granted a fifteen-minute recess to allow defense counsel to listen to the recordings,
¶ 16, After the brief recess, defense counsel reported that he had not had-time to listen to the entire CD because it contained seven recorded phone calls totaling about 157 minutes.[5] After further discussion, the judge ordered an additional recess until noon to allow counsel to listen to the entire CD. Following that recess, counsel disputed the district attorney’s characterization of the recordings as a “confession.” Counsel also argued that the recordings should be excluded because the State had committed a blatant discovery violation in failing to disclose evidence that it had possessed for over two years. Finally, he argued that if the evidence was not excluded, White was entitled to “a mistrial ... or alternatively a continuance for a period of time for us to reevaluate how we would proceed.”
¶ 17, The district attorney responded that the recess had given White “adequate time to review [the] evidence.” However, *865 the district attorney also stated that if the court found that White had been “surprised,” then the State should at least be allowed to use the recordings in rebuttal if White chose to testify. The district attorney further stated that if the court was “considering a continuance,” then the State would withdraw the evidence.[6] The district attorney also argued that the State’s failure to disclose the recordings was unintentional and a mere “oversight due to the number of robberies that were taking place where [White’s] name kept coming up time and again.” He stated, “[T]here [were] certain cases that [were] related to each other, and this tape was a part of a number of investigations, so when the police discovered the tape, they immediately turned it over .,.. ”
¶ 18. After hearing argument, the judge ruled that the trial would start as soon as the jury returned from lunch and that the recordings would be admitted if the State could lay a proper foundation. The judge acknowledged that he had not listened to any part of the CD and thus was unfamiliar with the specifics of any of the recorded conversations. Nonetheless, he ruled that White’s motion to exclude the evidence or for a mistrial or continuance would be denied because White was given “an opportunity to review the evidence” during the recess.
¶ 19. On the afternoon of the second day of trial, Wednesday, May 6, 2015, during the testimony of Detective Williams,, the State indicated that it was ready to introduce excerpts of the recordings to be played for the jury, but the State still had not identified the specific portions it intended to offer. Therefore, the court , recessed the trial for the day and instructed the parties to confer that afternoon and be ready to resume trial at 9 a.m. the following morning. However, on Thursday, May 7, defense counsel informed the court that the State did not provide a list of excerpts until 8:59 a.m, that morning, so he had not had an opportunity to listen to the five specific excerpts (about fifteen minutes of recordings in total) that the State intended to introduce. After another brief recess, the five excerpts were played for the jury and introduced into evidence.
¶ 20. In the first excerpt, 'White gives an unidentified woman directions to a house on Memphis Street.[7] He tells her that she ■will find “two guns' under” some shingles piled in the backyard of the house. He tells thé woman, “Get both of them and take them to your house and put them up.” White also tells her to “[c]all Islam,” meaning Islam Wilson. White seems to say that one of the guns belongs to Islam, but he tells the woman not to give Islam the gun. White continues:
Tell Islam I said just like this. Tell hiríi I said he gotta come down here and hold up for that ... white Toyota Corolla[8] that he got cause they trying to put it on me.... They trying to charge me with the car Islam got.[T]hey trying.to charge me with armed carjacking too for Islam’s robbing those dudes with a gun.... [H]e gotta come hold up for *866 that .... I ain’t fixin to hold up for no carjacking I ain’t actually did.
A different male voice can be heard on the recording, and White tells the woman that “Vonte” (Stamps) is there with him. Stamps seems' to express agreement with White that Islam needs to come “hold up” for one or more crimes, or else Stamps would have to implicate Islam, and Stamps did not want to be a “snitch machine.”
¶ 21. In the second excerpt, the woman apparently is at the house on Memphis Street. She finds one of the guns, a black gun, but cannot find the second one. White can then be heard saying, “Vonte, where the other gun at? ... She got one of them. She got the Ruger, the one I put up. She can’t-find the other one.” White then tells the woman that the other gun is “under that first pile,” and she finds it. White asks if she has talked to “little Islam,” and the woman says, “Yeah, but he ain’t telling me nothing good. He said he ain’t want to do it.”
¶ 22. In the third excerpt, which is not entirely audible, White discusses being arrested with Stamps after they fled from Bailey’s car. The woman says that she talked to Islam and “[h]e was trying to get a gun.” She says, “He asked for that other one. He don’t know I got them other two. He just know I got your nine.”
¶23. The fourth excerpt includes the following exchange, seemingly referring to Bailey’s Hyundai Sonata, the subject of Count IX of the indictment:
White: First I got to get that other charge off of me. When I get the other off my bond ain’t gonna be shit [inaudible] for sitting in the car with her. That ain’t shit. That’s just possession of stolen property.
Woman: So you wasn’t driving?
White: Nah. I was but they don’t know that. They don’t know who was driving .... They just charged me for being in the [car]. They charged Vonte with getting that [car] ■ with ■ armed robbery.
Woman: So how long he gotta be in there?
White: I don’t know. He ain’t going nowhere.
¶ 24. Finally, in the, fifth excerpt, the woman tells White that a woman named “Kiara” is going to help her deal with Islam. The woman had called Islam again, but he hung up on her. She tells White, inter alia, “I’ll set his ass up and let the police get him” and “I’ll set his ass up real quick and still don’t know anybody know I did it.” White responds, in part, “That’s the only way I’m going to get out, that’s the only way I’m gonna get my bond back .... [A] motherfucker trying to take me off these streets for the shit I ain’t did. If I would have did shit, I’m gonna hold up for my shit cause I’m out here doing this shit, you feel me.”
¶ 25. The defense called Islam as a witness at trial. Islam testified that he was 5’8” and 150 pounds. Islam then “pled the Fifth” when asked if he was the person who robbed and carjacked Penman, Davis, Thomas, and Taylor, and also in response to most of the State’s questions on cross-examination. In his closing argument, the district attorney asserted that Islam “is in jail for murder.” White objected, and the judge sustained and instructed the jury to disregard the prosecutor’s statement.
¶ 26. White had also filed a pretrial motion for a ruling on the admissibility of a what he claimed was a secretly recorded conversation between him and Islam. White alleges that Islam made inculpatory statements and essentially admitted his guilt on the call. However, the trial judge concluded that too little of the recording was audible to establish a proper context and relevance; the judge also concluded *867 that the recording was hearsay and could not be authenticated properly.

Verdict and Sentencing

¶27. The jury returned guilty verdicts on Counts I and II (armed robbery and armed carjacking of Penman), Counts V and VI (armed robbery and armed carjacking of Thomas), and Count IX (possession of stolen property—Bailey’s Sonata). The jury indicated that they could not agree on Counts III and IV (armed robbery and armed carjacking of Davis) and Cpunts VII and VIII (armed robbery and armed carjacking of Taylor), and the trial judge declared a mistrial on those counts. The trial judge subsequently sentenced White to terms of twenty-five years each on Counts I, II, V, and VI, and ten years on Count IV, with all sentences to be served concurrently. White filed a motion for judgment notwithstanding the verdict or a new trial, which was denied, and a notice of appeal.
DISCUSSION
¶28. On appeal, White raises eight issues. For the reasons that follow, we reverse and remand for a new trial on the first issue that White raises: the denial of his motion for a mistrial or a continuance based on the State’s failure to disclose the Simpson County jail recordings. We also address White’s speedy-trial and sufficiency-of-the-evidence claims and find those issues to be without merit. As White’s first issue requires a new trial, we need not address his remaining new trial arguments.

I. Discovery Violation/Denial of a Mistrial or Continuance

¶ 29. As discussed above, the State committed a clear discovery violation in this case by failing to disclose recordings of phone calls that White made from the Simpson County jail after his arrest. The recordings were in the State’s possession for over two years and were covered by White’s discovery requests, but the State failed to disclose their existence until just before opening statements, after the jury was already selected. “[T]his is precisely the sort of ‘trial by ambush’ that Mississippi has endeavored to outlaw.” Fulks v. State, 18 So.3d 803, 805 (¶ 9) (Miss. 2009). The recordings should have been excluded or a mistrial or continuance granted to allow White a reasonable opportunity to prepare to meet the newly disclosed evidence. Instead, defense counsel had to give his opening statement after being afforded just enough time to listen to ninety-five-plus minutes of garbled recordings that should have been produced at least sixteen months earlier. We conclude that this issue requires reversal and a new trial.

A. The State committed a clear discovery violation.

¶ 30. “The discovery rules apply to both the defendant and the State. The essential purpose of Rule 9.04 of the Uniform Rules of Circuit and County Court Practice is the elimination of trial by ambush and surprise.” Norris v. State, 735 So.2d 363, 365 (¶ 7) (Miss. 1999) (citing Robinson v. State, 508 So.2d 1067, 1070 (Miss. 1987)). Our Supreme Court has explained that “[disclosure is the hallmark of fairness and the quest for justice that should be the goal of the criminal justice system.” Robinson, 508 So.2d at 1070. To that end, Rule 9.04 requires the prosecution to disclose any recqrded statements of the defendant upon request. URCCC 9.04(A)(2). Such a request was made in this case, and the State clearly failed to comply with its discovery obligations.
¶ 31. The district attorney’s only excuse for the violation in this case—that, due to “oversight,” detectives did not provide the evidence to him until after jury selection— is inadequate as a matter of law. As Jus *868 tice Robertson explained over thirty years ago in Box-.
Another familiar excuse is that the police had the information but the prosecuting attorneys were not aware of it. This will not do. When police officers have been in possession of discoverable information for nine months, the State is entitled to no consideration because the District Attorney or his assistant did not look at the file until the night before trial. The State, in the present context, is a team consisting of the attorney, the law enforcement officers of the jurisdiction in which the case is brought, all other cooperating law enforcement officials ..., and any other persons cooperating in the investigation and prosecution of the case. What is known or available to any one or more is deemed known by or available to the State. All are collectively “the State” for present purposes.... When responding to requested or ordered discovery ..., the State, as here collectively defined, should disclose all information it has plus all information it could obtain with due diligence or upon reasonable inquiry.
Box v. State, 437 So.2d 19, 25 n.4 (Miss. 1983) (Robertson, J., specially concurring); accord King v. State, 656 So.2d 1168, 1174-76 (Miss. 1995). For purposes of this case, “the State” certainly included the lead detectives on the case, who were in possession of the CD for two years before it was produced just as trial was about to start. As Justice Robertson put it, “This will not do.”
¶ 32. Moreover, the explanation given for the discovery violation does not hold up. The district attorney claimed that the CD was overlooked because it was “part of a number of investigations,” all related and involving White. In other words, the CD was relevant to so many cases that the State forgot that it should be produced to the person recorded, who was under indictment in five such cases. Even White’s specific discovery request in January 2014 did not prompt the State to correct this regrettable “oversight.” Only sixteen months later, after a jury was selected and just prior to opening statements, did the State suddenly realize that it should turn over the CD to White. It is difficult to imagine a clearer violation of Rule 9.04.

B. The denial of a mistrial or continuance was an abuse of discretion.

¶ 33. Rule 9.04(1) provides as follows:
If during the course of trial, the prosecution attempts to introduce evidence which has not been timely disclosed to the defense as required by these rules, and the defense objects to the introduction for that reason, the court shall act as follows:
1. Grant the defense a reasonable opportunity to interview the newly discovered witness, to examine the newly produced documents, photographs or other evidence; and
2. If, after such opportunity, the defense claims unfair surprise or undue prejudice and seeks a continuance or mistrial, the court shall, in the interest of justice and absent unusual circumstances, exclude the evidence or grant a continuance for a period of time reasonably necessary for the defense to meet the non-disclosed evidence or grant a mistrial.
3. The "court shall not be required to grant either a continuance or mistrial for such a discovery violation if the prosecution withdraws its efforts to introduce such evidence.
URCCC 9.04(1).
¶34. As applied to this case, the rule required the court to “exclude the *869 evidence or grant a continuance for a period of time reasonably necessary for the defense to meet the non-disclosed evidence or grant a mistrial.” Id, Obviously, the court did not exclude the evidence or grant a mistrial, so the only issue is whether the two recesses just prior to opening statements provided “a period of time reasonably necessary for the defense to meet the non-disclosed evidence.” Id. The State argues that the denial of a mistrial or a continuance was not an abuse of discretion because the recesses were long enough for White and his attorney to listen to, the recordings. We cannot agree.
¶ 35. The State’s discovery violation in this case “produced the same result as that which drew the Box Court’s condemnation: a trial by ambush in which critically important evidence was sprung on a defendant with such abruptness that defense counsel had time neither to investigate its veracity nor to make meaningful preparation to meet it.” Fulks, 18 So.3d at 805 (¶ 8) (ordering a new trial because defendant was denied a continuance when, the day prior to trial, the State disclosed that a key witness had changed his testimony to implicate the defendant). Our Supreme Court has repeatedly held that in such a case, the defendant is entitled to a continuance or mistrial if the critical evidence is not excluded or withdrawn. See Norris, 735 So.2d at 364-65 (¶¶ 3-8) (ordering a new trial because the defendant was denied a continuance after the State disclosed twenty-five witness statements the day before trial); Galloway v. State, 604 So.2d 735, 740 (Miss. 1992) (ordering a new trial because the defendant was denied a continuance after the State disclosed a surprise witness during trial); Reuben v. State, 517 So.2d 1383, 1385-87 (Miss. 1987) (ordering a new trial because the defendant was denied a continuance after the State disclosed a key new witness three days prior to trial); see also Mims v. State, 730 So.2d 76, 78-80 (¶¶ 3-6) (Miss. Ct. App. 1998) (ordering a new trial because the defendant was denied a continuance after the State disclosed on the morning of trial that his former girlfriend would testify against him).
¶ 36. The discovery violation in this case was of a comparable significance. It is evident that part of defense counsel’s trial strategy had been to emphasize the State’s inability'to link White to ,any gun or guns used in the carjackings. Indeed, defense counsel questioned the State’s witnesses on this point and made the. argument even after the Simpson County recordings were disclosed. Needless to say, however, the recordings seriously undermined this strategy. The recordings enabled the district attorney to respond in closing argument:
I want you to listen to those audiotapes regarding those guns. It’s going to be the first two messages because all of us heard defense [cjounsel [questioning] the police officers from the stand, well, did you recover[] any weapons? The victims talk about with silver gun and black gun. Did you recover and [sic] weapons? No. But we know they didn’t recover any weapons, because Kadarius White hid them in the house off Miller Street. That’s where he sent his girlfriend to.... [White told her to] [g]o put them up. Make sure don’t nobody get them.- We know why we didn’t find the guns. They made sure we didn’t find them. He hid behind the house and he says that. Question answered. Problem solved.
¶ 37. The prosecution placed great emphasis on the recordings and discussed their contents at length during closing argument. In addition to using the recordings to tie White to guns matching the victims’ descriptions, the district attorney *870 argued that other parts of the recordings amounted to a “confession” and showed that White was scheming to “set up” Islam Wilson for the crimes. The district attorney’s interpretation of the recordings is open to debate. However, it is evident that these were not issues or arguments that White 'expected to have to address' based on the information that the State had produced in discovery. Put simply, White was “ambush[ed]” with “critically important evidence” that should have been disclosed sixteen months earlier. And he was then afforded no opportunity “to make meaningful preparation to meet it.” Fulks, 18 So.3d at 805 (¶ 8). White was entitled to a continuance or mistrial, and the denial of both was an abuse of discretion.

C. The error was not harmless.

¶ 38. On appeal, “the State does not concede that a discovery violation occurred”[9] but argues that “even if the Court finds that there was a discovery violation, the ... denial of a further continuance was harmless error.” Appellee’s Br. 17. The State contends that any error was harmless “because White could have been convicted without the information presented in the recording,” and' “[t]he State presented a substantial amount of evidence that adequately supports the guilty verdict.” Id. at 16 (emphasis added). The State’s argument misapplies the harmless-error rule, suggesting that we may affirm simply because other evidence in the record would have been sufficient to support the verdict. However, “[a]n error is harmless only when it is apparent on the face of the record that a fair minded jury could have arrived at no verdict other than that of guilty.” Young v. State, 981 So.2d 308, 313 (¶ 17) (Miss. Ct. App. 2007) (quoting Forrest v. State, 335 So.2d 900, 903 (Miss. 1976)).
¶ 39.. In this case, the district attorney stated that if the judge was inclined to grant White a continuance, the State would withdraw the untimely disclosed evidence.[10] Therefore, it is logical to assess the prejudice that resulted from the admission of the evidence, rather than only from the denial of a continuance or a mistrial. Applying the proper harmless-error standard, see Young, 981 So.2d at 313 (¶ 17), it cannot be said with assurance that the admission of the evidence was harmless.
¶ 40. Moreover, our Supreme Court has indicated that the harmless-error rule plays a limited role in the case of such a clear and significant violation of the discovery rules. In Norris, the Court reasoned that “[t]he night before a jury trial is a very busy time for even a well-prepared lawyer under the best of circumstances.” Norris, 735 So.2d at 365 (¶ 6). Recognizing this, the Court held that,
[ujnder Box and its progeny, the defendant- is not required to show prejudice, nor is he required to demonstrate what, if any, efforts have been made in order to rebut the late discovery. Neither’ our cases nor our rules require defendants to demonstrate prejudice where there has been a gross discovery violation by the State, as presented here.
Id. This reasoning applies in the instant case, which' involves a similarly “gross discovery violation” and an untimely disclosure on the day of trial rather than the “night before.”
*871 ¶41. Similarly, in Galloway, the Supreme Court stated:
We do not say there can never be a harmless discovery error. We remind one and all of the realities of the phenomena we address. In many discovery cases neither this Court nor the trial court is in a position to decide that a tardy disclosure of witnesses or evidence has or has not resulted in unfair surprise, or prejudice, to the defendant. Certainly this Court has only the cold record to read. That the record does not affirmatively reflect prejudice does not prove there has been none. Where there is prejudice, it often will arise from matters not of record, that by their very nature cannot be in the record. The line of questioning defense counsel failed to pursue because he did not have time to prepare will not appear. The rebuttal witness who could have impeached the prosecution’s surprise witness, but who was not found because the defense had no time to get out and search for him, will not be in the record. There are numerous other examples the experienced trial lawyer will readily call to mind. Our harmless error rule may not with justice be enforced on the assumption of a world that does not exist.
Galloway, 604 So.2d at 740 (emphasis in original).
¶42. The Court’s reasoning in Norris and Galloway fits this case. When defense counsel showed up for trial on Tuesday, May 5, 2015, a jury had already been picked, and he was prepared to give his opening statement based on the evidence that the State had disclosed in discovery. Without warning, the district attorney announced to the court that he intended to offer into evidence recorded phone conversations involving White, which he described as a “confession.” While the district attorney’s description of the recordings may have been overstated, there is no doubt that this newly disclosed evidence—which had been in the State’s possession for two years—was critically important. Following the district attorney’s surprise announcement, the trial was recessed just long enough for defense counsel to listen to the ninety-five-plus minutes of garbled phone calls. The recordings are not easy to understand or follow, and the State waited another two days before identifying the segments that it intended to use at trial. The prosecution then made extensive use of the evidence at trial, including to rebut one of the defense’s primary attacks on the State’s case. ,
¶ 43. It is impossible to know or reconstruct what defense counsel might have done had he been given a reasonable opportunity to prepare to meet this evidence. White was entitled to that opportunity under Rule 9.04, and “where there has been [such] a gross discovery violation by the State, as presented here,” our Supreme Court has stated that the defendant is not required “to demonstrate prejudice.” Norris, 735 So.2d at 365 (¶ 6). Accordingly, we reverse and remand for a new trial.

II. Speedy Trial

¶ 44. Although we reverse and remand for a new trial for the reasons discussed above, we also address White’s speedy-trial claim because violation of the defendant’s right to a speedy trial requires that the charges against him be dismissed with prejudice. See, e.g., Smith v. State, 550 So.2d 406, 409 (Miss. 1989). White alleges a violation of his statutory right to a speedy trial only, not his constitutional right. Mississippi Code Annotated section 99-17-1 (Rev. 2015) provides: “Unless good cause be shown, and a continuance duly granted by the court, all offenses for which indictments are presented to the *872 court shall be tried no later than two hundred seventy (270) days after the accused has been arraigned.” Nearly 600 days passed between White’s arraignment and trial; however, White concedes that nearly 400 days passed before he ever asserted his right to a speedy trial, at which point he filed a motion to dismiss on that ground.
¶ 45. This Court recently reaffirmed that a defendant waives his statutory right to a speedy trial if he fails to assert the right at any time prior to the end of the 270-day statutory period:
[T]his Court has repeatedly “held that if a defendant fails to raise the statutory right to a speedy trial within 270 days of his arraignment, he acquiesces to the delay.” Whitaker v. State, 114 So.3d 725, 730 (¶ 18) (Miss. Ct. App. 2012) (quoting Roach v. State, 938 So.2d 863, 867 (¶ 9) (Miss. Ct. App. 2006)); accord e.g., Mims v. State, 856 So.2d 518, 522 (¶ 11) (Miss. Ct. App. 2003); Malone v. State, 829 So.2d 1253, 1257 (¶ 11) (Miss. Ct. App. 2002) (citing Walton v. State, 678 So.2d 645, 649-50 (Miss. 1996)), The Supreme. Court has also held that “a defendant may effectively waive his right to complain of not being tried within the 270-day period set out in [section] 99-17-1, when the defendant does not request or assert his right to a speedy trial or object to a delay, especially when the defendant fails to show any prejudice in the failure to be tried within the statutory 270-day period.” Guice v. State, 952 So.2d 129, 142 (¶ 28) (Miss. 2007) (citing Walton, 678 So.2d at 650).
Collins v. State, No. 2016-KA-00422-COA, 2017 WL 2263764, at *3 (¶ 16) (Miss. Ct. App. May 23, 2017). White failed to assert his statutory right to a speedy trial until well after the statutory period had run. Therefore, his statutory claim is waived and without merit.[11]

Ill, Sufficiency of the Evidence

¶46. White also argues that there is insufficient evidence to sustain his convictions on Counts I, II, V, and VI. White primarily argues that Penman and Thomas were not credible witnesses because, in their initial reports to police,' they described a perpetrator who was taller and heavier than White. We address White's argument because a determination that the evidence was insufficient would mandate a judgment of acquittal on these counts, and retrial on the charges would be barred by the Double Jeopardy Clause of the United States Constitution, See generally Burks v. United States, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978).
¶47. When the defendant challenges the sufficiency of the evidence, “the relevant question is whether, after viewing the'evidence in the light most favorable to the prosecution, any rational trier of fact could have found the' essential elements of the crime beyond a reasonable doubt.” Bush v. State, 895 So.2d 836, 843 (¶ 16) (Miss. 2005) (quoting Jackson v. Virginia, 443 U.S. 307, 315, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). The issue on appeal is not whether we would have found White guilty on the relevant counts based on the evidence presented at trial; rather, his conviction,must be affirmed if there was enough evidence for “any rational trier of fact” to have rendered a guilty verdict, Id.
*873 ¶ 48. “The jury sits as trier of fact and is charged with the duty of determining what weight and worth to afford the. testimony of the various witnesses.” Woods v. State, 883 So.2d 583, 589 (¶ 16) (Miss. Ct. App. 2004). “It is the obligation of defense counsel to test the credibility of adverse witnesses,” including by “pointing out prior inconsistencies in reports of the same incident made by the witness.” Id. “However, even an unequivocal showing that a witness has related a version of events at some earlier time substantially at variance with that offered at trial does not necessarily destroy the evidentiary value of the witness’s in-court testimony.” Id. “It is simply a matter for the jury to consider when it evaluates the probative value of the witness’s version of events related at trial.” Id.
¶ 49. The evidence presented at trial in this case, viewed in the light most favorable to the prosecution, was sufficient for a rational trier of fact to find, beyond a reasonable doubt, that White was guilty on the charges of robbing and carjacking Penman and Thomas. Both Penman and Thomas positively identified White as the perpetrator in non-suggestive, six-person photo lineups. Also, both reaffirmed their identifications at trial. The issues that White raises on appeal go to the weight of their testimony, not its legal sufficiency. These are issues for a jury to determine at trial and are not a basis for entry of a judgment of acquittal. Accordingly, this issue is without merit.
CONCLUSION
¶ 50. For the foregoing reasons, we reverse White’s convictions on Counts I, II, V, VI, and IX and remand the cáse for a new trial.
¶ 51. REVERSED AND REMANDED.
LEE, C.J., GRIFFIS, P.J., BARNES, ISHEE, FAIR AND WESTBROOKS, JJ., CONCUR. GREENLEE, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION. CARLTON, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY IRVING, P.J., AND GREENLEE, J.

. The trial judge overruled White’s objections that Penman’s testimony was "scientific evidence” and that the State had not shown that “how the app works or whether’s it’s reliable [or] what the app even is.”

. Davis testified at trial that the incident occurred around 11:20 or 11:30 p.m. However, JPD. Detective Kenneth West testified that the crime was reported at 10:27 p.m.

. The Willow Point Apartments are located on Glencross Drive, west of State Street, between Beasley Road and County Line Road.

. The Willow Creek Apartments are located off of Edgewood Terrace, just west of 1-55, near McWillie Elementary School.

. The actual total length of the conversations is around ninety-five minutes. The recordings are not high quality, and the conversations -are difficult to understand.

.See URCCC 9.04(I)(3) ("The court shall not be required to grant either á continuance or mistrial for such a discovery violation if the prosecution withdraws its efforts to introduce such evidence.”) (replaced by MRCrP 17.9(b)(3)). The Mississippi Rules of Criminal Procedure went into effect July 1 of this year. Rule 17.9 is based on former Rule 9.04 of the Uniform Rules of Circuit and County Court, which was in effect when White was indicted. MRCrP 17 cmt.

. White was arrested in the vicinity of Memphis Street.

. Recall that a white Toyota Corolla was taken from Penman,

. The State does not explain how the failure to disclose the recordings was not a discovery violation.

. See URCCC 9.04(I)(3) (“The court shall not be required to grant either a continuance or mistrial for such a discovery violation if the ' prosecution withdraws its efforts to introduce such evidence.”).

. A defendant's failure to assert his constitutional right to a speedy trial does not operate as a waiver of the right but is one of the factors to be weighed in determining whether the right has been violated. Barker v. Wingo, 407 U.S. 514, 528-29, 531-32, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). As noted above, White does not allege a violation of the constitutional right.