# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2018-KA-00981-SCT

*DEIONTA IVORY a/k/a DEIONTA JONTEL*
*IVORY*

*v.*

*STATE OF MISSISSIPPI*

DATE OF JUDGMENT: 06/15/2018
TRIAL JUDGE: HON. PAUL S. FUNDERBURK
TRIAL COURT ATTORNEYS: CHRISTOPHER EDWIN BAUER
 LUANNE STARK THOMPSON
 TIMOTHY BAXTER TUCKER
 NEBRA EVANS PORTER
 KYLE DAVID ROBBINS
COURT FROM WHICH APPEALED: MONROE COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT: OFFICE OF STATE PUBLIC DEFENDER
 BY: GEORGE T. HOLMES
ATTORNEY FOR APPELLEE: OFFICE OF THE ATTORNEY GENERAL
 BY: ALICIA AINSWORTH
DISTRICT ATTORNEY: JOHN WEDDLE
NATURE OF THE CASE: CRIMINAL - FELONY
DISPOSITION: AFFIRMED - 09/19/2019
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE KITCHENS, P.J., MAXWELL AND CHAMBERLIN, JJ.**

**KITCHENS, PRESIDING JUSTICE, FOR THE COURT:**

¶1.    Deionta Ivory was convicted by the Monroe County Circuit Court on counts of armed

robbery and kidnaping. Ivory's trial attorney moved *ore tenus* for judgment notwithstanding

the verdict (JNOV), but he did not make a post-trial motion for a new trial.

¶2.    On appeal, Ivory argues that the verdicts were contrary to the overwhelming weight

of the evidence, and he requests a new trial. He contends that his *ore tenus* motion for JNOV

should be construed as a motion for a new trial because the motion challenged the weight of the evidence. In the alternative, Ivory argues that, if the issue was not preserved, his trial court attorney's failure to move for a new trial constitutes ineffective assistance of counsel.

¶3. This Court finds that the trial attorney's *ore tenus* motion was not a motion for a new trial. Respecting Ivory's ineffective-assistance-of-counsel claim, a new trial is not warranted. While the trial attorney's omission did constitute deficient performance, Ivory suffered no prejudice because his convictions were supported by the overwhelming weight of the evidence.

¶4. Accordingly, Ivory's request for a new trial is denied, and we affirm his convictions and sentences.

**FACTS**

¶5. On December 18, 2016, the Amory Police Department received a 911 call at approximately 7:40 p.m. from a Chevron gas station located on Highway 278 in Amory, Mississippi. The gas station clerk reported that a man with a handgun had accosted two people who were sitting in an idling car by entering the vehicle's back seat and demanding their money. At the time of the 911 call, the two individuals—fourteen-year old Emilee Slade and sixteen-year-old Evan Burks—had exited the vehicle and entered the station. The clerk had locked the door to await the arrival of law-enforcement officers. Chevron surveillance video depicts the alleged assailant leaving the vehicle moments after Slade and Burks had

2

entered the Chevron gas station; the man, after leaving the car, disappears from the surveillance video.

¶6. Amory police responded to the call within minutes and immediately began to search the area. The teenagers identified the suspect as a tall, black male wearing dark clothes, including a "hoodie," a dark "puffy" jacket, and a toboggan.[1] Shortly after their arrival, officers stopped a black man near the Chevron station who appeared to match the description provided, but they released him after that man was found not to be the suspect. Don Meredith, an Amory police investigator, interviewed the victims, reviewed the Chevron surveillance video, and took DNA samples from the vehicle the suspect had exited.[2] Officers did not acquire latent fingerprints from the vehicle. According to Amory Police Officer Josh Bennett, another man who was stopped for questioning stated that he had seen someone matching the suspect's description walking to a nearby grocery store.

¶7. Upon learning the location of a potential suspect, Amory police officers proceeded to Food Giant, a supermarket near the Chevron gas station.[3] Officer Bennett testified that, as the officers entered the store, "at one of the first [cash] registers there on the left there was

---

[1]Amory Police Officer Josh Bennett testified he received the description of the suspect as a black male, more than six feet tall, wearing a black jacket and sweat pants.

[2]According to Amory Police Criminal Investigator Don Meredith, the DNA sample collected from the vehicle was insufficient to produce a DNA profile after a crime-laboratory analysis.

[3]Food Giant is located on Highway 278 less than a mile from the Chevron station. The Subway sandwich shop—where Slade and Burks testified the assailant approached them—also adjoins Highway 278 and Food Giant.

3

a black male facing away from us with the clothing description, [and] about the same height." That man was Deionta Ivory.

¶8.     As the officers approached and searched him, Ivory, according to multiple officers present, stated, "I didn't rob anybody." Bennett testified, along with other officers, that Ivory was wearing "a black hoodie" with "black sweatpants that were pulled down a little below his waist, revealing what looked like to be [a] navy blue . . . undergarment." After stopping and questioning Ivory, the officers took him into police custody. Officers searched Ivory and found no weapons. Ivory's vehicle was parked and running in the Food Giant parking lot. Ivory consented to a search of his vehicle; the search did not reveal anything.

¶9.     After Ivory's arrest, Investigator Meredith found and interviewed another person of interest and met with Burks and Slade to narrow their identification of the suspect.

¶10.     Meredith prepared photograph lineups for Burks and Slade; the lineup presented to Burks exhibited eighteen photographs, including Ivory and the other person of interest. Burks testified that he had identified Ivory when the lineup was shown to him. The lineup presented to Slade contained twenty-four photographs, including Ivory. Slade testified that she had also identified Ivory when the lineup was shown to her.

¶11.     Meredith also collected and reviewed Food Giant surveillance video from December 18. The video footage revealed that Ivory was present at Food Giant at least twice that evening: once at approximately 7:00 p.m. and again at approximately 8:14 p.m., shortly

4

before his arrest.[4] According to Meredith, the Food Giant videos depict Ivory wearing "[a] dark hoodie sweatshirt with a camo toboggan on . . . a black rim around the end of it, and [] dark-colored sweatpants on." Meredith testified that Ivory did not have on a black "puffy" jacket during his trips to Food Giant; but, according to Meredith, Ivory may have "changed tops." Meredith acknowledged that the Chevron video of the suspect depicted the alleged assailant "wearing a vest with a light-colored jacket underneath."[5]

¶12.   Meredith interviewed Ivory on December 21, 2016, after Slade's and Burks's identifications. Ivory waived his Miranda rights and denied involvement in the alleged incident. Ivory claimed that he had traveled to his residence—located at Pope Apartments in Amory—between his two Sunday evening trips to Food Giant.[6]

¶13.   Ivory gave written consent for Meredith to search his residence. During the search later that day, Amory police officers took possession of a replica pistol from Ivory's night

---

[4]According to Amory police officers, the Subway sandwich shop did not have outdoor video surveillance for December 18.

[5]The surveillance videos from Food Giant of Deointa Ivory and from the Chevron gas station of the assailant were shown to the jury and entered into evidence. Meredith identified Ivory's presence in the surveillance videos from Food Giant before and after the alleged incident. Haley Chism worked at the Chevron and testified at trial that she been present at the gas station on December 18. According to Chism, she knew Ivory because the two had attended high school together. Chism testified that she watched the Chevron surveillance video but that the man who exited the vehicle did not look like Ivory.

[6]Ivory later admitted traveling to an additional location—Moore Manor Apartments—to buy marijuana between his trips to Food Giant. A witness testified that video surveillance from Moore Manor on December 18 had existed, but it had been "recorded over."

stand. The officers also seized "a large, black down puffy jacket, and also collected a toboggan that [Ivory] had with a bunch of other toboggans that were there." Meredith testified that he "picked . . . [what] most closely resembled what I thought was worn in the video from Chevron."[7]

¶14. A Monroe County grand jury indicted Ivory on one count of attempted armed robbery of Evan Burks under Mississippi Code Section 97-3-79 (Rev. 2014), and one count of kidnaping of Burks and Emilee Slade under Mississippi Code Section 97-3-53 (Rev. 2014).

¶15. Burks and Slade testified at trial. Slade recounted that she had sat with Burks in his car after leaving an Amory Subway sandwich shop. While the vehicle idled in the Subway parking lot, a man tapped on the car's passenger window and asked the two for food. Slade testified that the man then exhibited a firearm and said "this is a robbery."

¶16. According to Slade, the man entered the back seat of the car and asked Burks to drive to a bank to "get $300." Slade testified that "I could see his face" from light from the Subway's windows and from another adjacent restaurant. Burks drove the car to a bank near a local Wal-Mart store, but he did not withdraw money. Burks continued to drive on Highway 278 in Amory until he proceeded to the Chevron gas station; Slade testified that the man asked Burks to enter the Chevron station and buy him a pack of cigarettes.

---

[7]Burks identified the pistol found during the search as consistent with the pistol used during the incident. Burks also identified the seized vest as consistent with the vest the robber had worn because "it looks just like it" as a "black jacket."

¶17. Burks exited the vehicle first at the Chevron while Slade remained in the car with the man. According to Slade, the man continued a conversation with her until he asked Slade to enter the Chevron station and "hurry [Burks] up." Slade left the vehicle and entered the Chevron, after which the store clerk called 911. Slade identified the man as "about 6'2 . . . [b]etween 170 and 190 [pounds]. . . . [and] in his twenties." She testified that she saw the Chevron surveillance video of the man leaving the vehicle shortly after she entered the Chevron station. At trial, Slade identified Ivory as the perpetrator.

¶18. Burks testified that he was sitting in an idling car preparing to leave the Subway restaurant with Slade when a man approached the vehicle and asked for food. At trial, Burks identified Ivory as the man.[8] According to Burks, when Slade and Burks communicated that they had no food the man displayed a gun. Burks described the gun as a black, semi-automatic pistol "like a [G]lock" and "[n]ot a revolver."

¶19. According to Burks, the man entered the back seat and asked Burks to "give me your money." Burks testified that he gave the man all of the money he had: $6. Burks also testified

---

[8]Burks testified he "got a clear look at [the man] two good times," specifically

The first time is when he first approached the car, knocked on the window, and I could see him, because Subway has exterior lights around the building. So I was able to see him then. And then when you open a door car, the interior lights come on. So when he opened the car door, I was able to see him then.

Burks also testified during his in-court identification that he was "[w]ithout a doubt in my mind" that Ivory was the assailant.

7

that the man told him to drive to a bank to withdraw money; Burks drove to a nearby bank but did not exit the vehicle.

¶20. Burks testified that he continued driving briefly until the man told him to stop at the Chevron station to buy a pack of cigarettes. Burks exited the vehicle, entered the gas station, and told the store clerk to call the police. Burks testified that the suspect "dipped" from the vehicle and "was gone" moments after Slade entered the Chevron station.

¶21. After the trial court denied the defense's motion for a directed verdict, the defense called multiple witnesses, including Ivory.

¶22. Ivory's defense concerned his alleged speech impediment. Slade testified that the man in the vehicle did not have a problem with his speech. Burks also testified that this man did not stutter and spoke "normal."[9] Meredith testified that he did not notice any speech impediment.

¶23. The defense called Sylvia Koonce, Ivory's mother, to "discuss whether or not [Ivory] has ever had any speech issues." Koonce testified that Ivory began to stutter from an early age, that his condition was hereditary, and that the stutter was "trigger[ed]" in stressful situations. Toshemie Wilson, an Amory High School teacher, testified that Ivory stuttered during school; specifically, when Ivory responded in conversation, he would speak in a "low

[9]Amory Police Criminal Investigator Andy Long also was present with other law enforcement during Ivory's arrest at the Food Giant. Long was acquainted with Ivory before his arrest and testified that Ivory, in their previous interactions, stuttered "at times" and "off and on." Long testified that Ivory stuttered with "some words" while talking with the officers during the stop.

tone so that . . . people would not hear him stutter." Wilson testified Ivory's stutter would increase in the presence of unfamiliar people; further, "if [Ivory] was in a stressful environment, his stuttering would increase even more" and Ivory "did [not] have the ability to turn [his stutter] on or off."

¶24. Bo Young, a cashier at Food Giant during the incident and a prior acquaintance, testified that he had seen Ivory in the store twice on December 18. Young testified that Ivory entered Food Giant the first time, bought a Black & Mild cigar, and asked to receive "cash back" from a card. Ivory entered the store a second time to buy a candy bar and also to receive "cash back." Young testified that, during Ivory's second appearance at Food Giant, he saw law-enforcement officers enter the parking lot; Young asked Ivory, "what [are] the police doing?" In response, Ivory said he was not sure. According to Young, Ivory repeatedly asked "what did I do?" after the police entered and stopped him. Young additionally testified that Ivory did not stutter during their conversations that evening but that Ivory "generally [does not] have great communication" and that "he drags his words . . . out."

¶25. Ivory testified that he had been at a friend's house before going to Food Giant the first time to withdraw money off a card. Ivory explained that he left Food Giant to make a purchase at Moore Manor, an Amory apartment complex. Ivory testified that he left Moore Manor then and went to his house before returning to Food Giant the second time.

¶26. According to Ivory, he drove to Moore Manor Apartments between his trips to Food Giant to buy marijuana and went home to "drop the weed off." Ivory testified he went back

9

to Food Giant to "get some more money off my card" to buy more marijuana. Officers found marijuana in Ivory's sock when they searched Ivory at Food Giant.

¶27. Ivory estimated twenty to thirty minutes elapsed during his trip from Food Giant to Moore Manor and that he was at home approximately ten minutes before returning to Food Giant the second time.

¶28. Ivory testified that he stated, "I didn't rob anybody" at the Food Giant because he was aware that an incident had occurred at Chevron earlier that night. Ivory claimed that he had seen police cars at the Chevron while driving before his second trip to Food Giant and "figured that Chevron probably got robbed or something like that." Further, Ivory testified that "the first thing in my head [at Food Giant] was [the officers] probably think I did it [because] I [had] on a black hoodie and some black pants."

¶29. During cross-examination, the State asked Ivory why he had said he was not sure about the evening's events during his first interview with Investigator Meredith. Specifically, the State asked Ivory whether "we can at least agree . . . that you were within eyesight of the Chevron at 7:42 p.m. on December 18, 2016." According to the State, phone records revealed that Ivory had a telephone conversation with Sierra Wall—his girlfriend—at approximately 7:42 p.m. Ivory testified that at approximately 7:42 p.m. he was passing the Chevron station "in [his] truck . . . going back to Food Giant." Ivory also testified that he was aware that an event had occurred at Subway while he was at Food Giant before his arrest and that he had acquired this knowledge from hearing from "other people" who were "talking about it."

10

Ivory explained that he did not reveal his trip to Moore Manor Apartments during the initial interview with Meredith because of his marijuana purchase.

¶30.    Ivory testified that on December 18, he had worn a black Nike pullover, black Aeropostale pants . . . [with] writing down my leg . . . [with white] bold letters, where you can see it." Ivory stated that he did not change clothes between his trips to Food Giant. Ivory said that he had not been wearing the black vest or toboggan that were seized during the search of his residence.

¶31.    Sierra Wall testified that she had talked with Ivory at least twice on December 18: at approximately 7:27 p.m. and 7:42 p.m.[10] According to Wall, following their conversation at 7:27 p.m., Ivory was meeting with an individual to buy marijuana. Wall testified that at 7:42 p.m., Ivory communicated that he had left that person's residence and was driving to Food Giant. According to Wall, during their 7:42 p.m. conversation, Ivory had told her to "be careful because there [are] a lot of police out there" and that "we stayed on the phone for I think seven minutes." Additionally, Wall testified that Ivory stutters, "[e]specially when he gets nervous or anything like that, talking in front of anybody."

¶32.    At trial, Investigator Meredith identified the gun discovered at Ivory's residence as a replica 1911 Colt .45 pistol that shoots spring-loaded plastic projectiles. Meredith testified that the gun was manufactured with a red identifier on the barrel to show that it was a replica,

---

[10]Meredith maintained on cross-examination, during rebuttal, that his "position [was] that between 7:27 and 7:42 . . . [there] was enough time for this crime to have been committed[]."

but the indicator had been removed. Meredith opined that the indicator can be removed "to make it look like a real firearm."

¶33.    Ivory testified that he did not carry the replica pistol with him on December 18. He stated that he kept the pistol for his protection if it became necessary to scare an intruder away but that the pistol remained in his bedroom. Wall also testified that Ivory owned a toy gun but that she never saw the gun after he first obtained it. On cross-examination, the State introduced into evidence photographs from Ivory's cell phone that depicted him wielding what appeared to be a handgun.

¶34.    The jury returned a verdict of guilty on both counts, finding Ivory guilty of armed robbery instead of the indicted offense of attempted armed robbery.[11] During the sentencing hearing, the defense made a motion for JNOV. Ivory's attorney argued "that the jury's final decision, when weighed against the evidence presented by the defense witnesses, would

---

[11]Both attorneys agreed to a jury instruction that addressed both armed robbery and attempted armed robbery. Though the issue was not raised on appeal, both armed robbery and attempted armed robbery are defined by Mississippi Code Section 97-3-79 and carry the same penalty. Miss. Code. Ann. § 97-3-79 (Rev. 2014). *See also* **Davis v. State**, 684 So. 2d 643, 660 (Miss. 1996) ("Of import is the fact that any robbery occurred. All defenses and proof available to Davis remained equally applicable. Therefore, the amendment was one of form and not substance."); **Harris v. State**, 445 So. 2d 1369, 1370 (Miss. 1984) ("Comparison of the above quoted code section and the indictment reveal that in Mississippi *both an attempt to take and an actual taking* of another's personal property against his will by violence to his person or by putting such person in fear of immediate injury to his person by the exhibition of a deadly weapon constitutes robbery. Therefore, the wording of the indictment comports with the law . . . ."); **Glenn v. State**, 996 So. 2d 148, 155 (¶ 29) (Miss. Ct. App. 2008) ("All of the elements necessary for attempt and for armed robbery are present, including the specific overt acts that took place . . . .").

indicate that their decision went against the evidence of certain physical attributes that would show [] Ivory not to have been the assailant in this matter." The motion was denied by the trial judge during the sentencing hearing.

¶35.   Ivory was given two consecutive sentences: a forty-year sentence, with ten years suspended, for armed robbery, and a thirty-year sentence for kidnaping. On June 9, 2018, Ivory appealed.

¶36.    On appeal, Ivory advances the principal argument that the verdicts were contrary to the overwhelming weight of the evidence, and, secondarily, that his trial attorney's failure to make a post-trial motion for a new trial constituted ineffective assistance of counsel. Ivory argues that his *ore tenus* motion for JNOV should be construed by this Court as a motion for new trial.

## DISCUSSION

**I.       Whether the verdicts were contrary to the overwhelming weight of the evidence.**

*A.       Motion for JNOV*

¶37.   Because Ivory's attorney made an *ore tenus* motion for JNOV and because the defense made no motion for a new trial, this Court must determine whether his *ore tenus* motion should be construed as a motion for a new trial.[12]

---

[12]This Court has held that

[t]he standards for review of a denial of a judgment notwithstanding the verdict (JNOV) and for denial of a new trial require differing analyses. A

13

¶38.    "In order to preserve the issue for consideration on appeal, the defendant must raise the issue that the verdict was against the overwhelming weight of the evidence as a ground for his motion for new trial." *Murray v. State*, 802 So. 2d 107, 109 (¶ 6) (Miss. Ct. App. 2001) (citing *Howard v. State*, 507 So. 2d 58, 63 (Miss. 1987)). The movant "must set out specific, not general, facts." *Harrison v. McMillan*, 828 So. 2d 756, 763 (¶ 21) (Miss. 2002) (citing *Sheffield*, 749 So. 2d at 126) (reviewing a post-trial motion styled as a motion for new trial). A motion for a new trial will fail for an "unquestionably [] vague and general statement" that does not "distinguish any particular deficiency in the proof." *Leonard v. State*, 972 So. 2d 24, 30 (¶ 24) (Miss. Ct. App. 2008).

¶39.    Additionally, the Mississippi Rules of Criminal Procedure require a "written motion of the defendant" to "vacate any judgment and grant a new trial." MRCrP 25.1. The rule provides that a motion for a new trial must be made "within ten (10) days after entry of judgment (which, for purposes of this Rule, includes both adjudication of guilt and sentence)." *Id.*

---

denial of a judgment notwithstanding the verdict is subject to *de novo* review on appeal. *Daniels v. State*, 107 So. 3d 961, 963 (Miss. 2013) (citing *Johnson v. St. Dominics–Jackson Mem'l Hosp.*, 967 So. 2d 20, 22 (Miss. 2007)). "A motion for JNOV is a challenge to the legal sufficiency of the evidence." *Id.* Conversely, "[a] motion for a new trial falls within a lower standard of review than does that of a judgment notwithstanding the verdict. . . . A motion for a new trial simply challenges the weight of the evidence." *Daniels*, 107 So. 3d at 963 (quoting *Sheffield v. State*, 749 So. 2d 123, 127 (Miss. 1999)).

*Kirk v. State*, 160 So. 3d 685, 695 (¶ 24) (Miss. 2015).

¶40. Ivory and the State agree that the trial attorney made a "motion for judgment notwithstanding the verdict" during the sentencing hearing and that Ivory's attorney did not request a new trial. Ivory argues that "Ivory's trial counsel moved for a JNOV here but appears to have argued based on the weight of the evidence." The trial judge denied the motion. Ivory did not make another post-trial motion. His only post-trial filings concern this direct appeal.[13]

¶41. Ivory's motion for JNOV cannot be construed as a motion for a new trial. Clearly, Ivory's attorney failed to make a cognizable motion for a new trial. The judge denied the JNOV motion that defense counsel did make, and Ivory is not allowed to recharacterize the style or substance of the motion.[14] Moreover, the trial court was not tendered a proper written motion for a new trial. *See, e.g.*, ***Cooper v. Lawson***, 264 So. 2d 890, 891 (Miss. 1972) ("[B]efore a litigant can avail himself of the contention the verdict is against the weight of the evidence, it is essential that the contention be embodied in a motion for a new trial in the lower court and be passed upon by the trial judge. The reason underlying the rule is that a trial judge cannot be put in error on a matter which was never presented to him for decision." (citing ***Clark v. State***, 206 Miss. 701, 39 So. 2d 783 (1949))); ***Tutor v. State***, 271 So. 3d 552, 556 (¶ 11) (Miss. 2018) (internal quotation marks omitted) ("The failure to preserve a matter

---

[13]Those post-trial filings are his trial attorney's motion to withdraw and for appointment of appellate counsel and the notice of appeal.

[14]The judge ruled that, "based on the evidence presented to the jury, the motion is denied."

15

by motion for new trial . . . may also serve as a procedural bar to its consideration by an appellate court." (quoting *Alonso v. State*, 838 So. 2d 309, 313 (Miss. Ct. App. 2002))).

¶42. The Court finds, under these circumstances, that Ivory could not and did not raise a weight-of-the-evidence challenge by means of an *ore tenus* JNOV motion. Accordingly, with respect to this argument, we hold that Ivory has not preserved the weight-of-the-evidence issue for appeal.

### B. Ineffective Assistance of Counsel

¶43. In the alternative, Ivory argues that he received ineffective assistance of counsel because "the trial court [was] not given the opportunity to rule on the weight of the evidence." Ivory avers that "failure to file a post-trial motion for new trial waives a defendant's right to argue on appeal that the verdict is against the overwhelming weight of the evidence," and that the record demonstrates that these verdicts were contrary to the overwhelming weight of the evidence.

¶44. A criminal defendant has a right to effective assistance of counsel under our state and federal constitutions. U.S. Const. amends. VI, XIV; Miss. Const. art. 3, § 26; *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). "While post-conviction proceedings are often the most appropriate forum for review of ineffective assistance of counsel, we 'may nevertheless reach the merits of the ineffectiveness issue where . . . the record affirmatively shows ineffectiveness of constitutional dimensions. . . .'" *Taylor v. State*, 167 So. 3d 1143, 1146 (¶ 5) (Miss. 2015) (quoting *Read v. State*, 430 So. 2d 832, 841

16

(Miss. 1983)). Ivory's claim of ineffective assistance of counsel is based on facts fully apparent from the record, and this Court is entitled to review that claim.

¶45.    The benchmark for ineffective assistance of counsel is whether performance of counsel "'undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.'" *Foster v. State*, 687 So. 2d 1124, 1129 (Miss. 1996) (quoting *Strickland*, 466 U.S. at 686). *See also* *Holly v. State*, 716 So. 2d 979, 989 (¶ 37) (Miss. 1998) ("This Court looks at the totality of circumstances to determine whether counsel's efforts were both deficient and prejudicial." (citing *Carney v. State*, 525 So. 2d 776, 780 (Miss. 1988); *Read*, 430 So. 2d at 839)). "Whether a defendant has received ineffective assistance of counsel is a question of law reviewed *de novo* under two prongs: '[f]irst, the defendant must show that counsel's performance was deficient. . . . Second, the defendant must show that the deficient performance prejudiced the defense.'" *Taylor*, 167 So. 3d at 1146 (¶ 5) (alteration in original) (quoting *Strickland*, 466 U.S. at 687).

¶46.    Under the first prong, the defendant must prove that the attorney's performance was deficient, and "[t]here is a strong but rebuttable presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Holland v. State*, 656 So. 2d 1192, 1197 (Miss. 1995) (citing *Carney*, 525 So. 2d at 780; *Gilliard v. State*, 462 So. 2d 710, 714 (Miss. 1985)).

¶47.    The second prong is met if "the defendant . . . show[s] there is reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

17

different." ***Hannah v. State***, 943 So. 2d 20, 24 (¶ 6) (Miss. 2006) (citing ***Strickland***, 466 U.S. at 694). We review evidence "in the light most favorable to the verdict and disturb the verdict only when it is so contrary to the overwhelming weight of the evidence that to allow it stand would sanction an unconscionable injustice." ***Little v. State***, 233 So. 3d 288, 292 (¶ 1) (Miss. 2017).

¶48.    The trial attorney's inaction here satisfies the first prong. This Court has held that the failure to make a post-trial motion for new trial constitutes deficient performance because "the trial judge [does] not have an opportunity to reconsider whether the verdict was contrary to the overwhelming weight of the evidence." ***Parker v. State***, 30 So. 3d 1222, 1235 (¶ 48) (Miss. 2010). Here, there was "[n]o strategic reason" for the trial attorney's failure to file "a motion for a new trial arguing that the verdict was contrary to the overwhelming weight of the evidence." ***Woods v. State***, 242 So. 3d 47, 58 (¶ 50) (Miss. 2018).

¶49.    Regarding the second prong, the Court must determine whether trial counsel's failure to make a proper motion for new trial prejudiced the defendant. The Court "consider[s] whether a reasonable probability exists that the trial court would have granted the motion." ***Id.*** at 58-59 (¶ 50). No prejudice results from that failure if there is no reasonable probability that the motion would have been granted. ***Pace v. State***, 242 So. 3d 107, 117-18 (Miss. 2018) (¶ 27) (defendant must show, "'but for counsel's unprofessional errors, the result of the proceeding would have been different.'" (quoting ***Strickland***, 466 U.S. at 694)); ***Giles v. State***, 187 So. 3d 116, 121 (¶ 13) (Miss. 2016) (internal quotation marks omitted) ("A

18

reasonable probability is a probability sufficient to undermine confidence in the outcome."

(quoting **Strickland**, 466 U.S. at 694)).

¶50.   Ivory, in measuring this failure to consider the overwhelming weight of the evidence,

contends that the verdicts work an "unconscionable injustice." Ivory argues that the trial

court would have considered that

> [i]t was clearly established that Ivory has a life-long and readily apparent
> speech impediment. . . . [N]either Slade nor Burk[s] perceived any speech
> problem with the man who allegedly [kidnaped] and tried to rob them with a
> handgun. The fact that the assailant did not stutter combined with the timeline
> evidence, the inconclusive clothing evidence, and conflicting description of the
> alleged weapon involved, supports only one reasonable conclusion – Slade and
> Burk[s] misidentified Ivory as the man who [kidnaped] and tried to rob them.

¶51.   The State maintains that no new trial should be ordered because the verdict is

supported by the weight of the evidence, first and foremost, that Slade and Burks did identify

Ivory as the perpetrator. Further, Ivory admitted that he was near the crime scene at the time

of the incident—he acknowledged passing by the Chevron station at approximately 7:42

p.m.—and being at a nearby supermarket shortly afterward. The State also argues that "he

was wearing clothing matching the description of the suspect . . . and that [Burks] identified

the gun recovered from Ivory's apartment as consistent with the gun he pointed in his face

during the crime."

¶52.   This Court, in numerous decisions, has reviewed the sufficiency and weight of the

evidence, to consider whether a new trial was required. *See*, *e.g.*, **Pace**, 242 So. 3d 107, 119

(¶ 34) ("[There is not] a reasonable probability that the trial court would have found that the

19

evidence preponderated so heavily against the verdict that the verdict was against the overwhelming weight of the evidence."); **Parker**, 30 So. 3d at 1235 (¶ 49) (Miss. 2010) ("[T]he trial judge would [not] have granted the motion for a new trial had he been afforded a second chance to review the evidence . . . .").

¶53.  Ivory cites our recent decision in **Woods** as an example of a case in which the weight of evidence was "sufficient to undermine confidence in the outcome." **Woods**, 242 So. 3d at 55 (¶ 61) (citing **Giles**, 187 So. 3d at 120-21). In **Woods**, the defendant was convicted of murder following the shooting of his girlfriend's estranged husband; the shooting followed an altercation at the girlfriend's home. **Id.** at 51-54 (¶¶ 1-22). We found that "[h]ad the trial court been presented with a motion for a new trial, it would have evaluated the evidence and the applicability of the Castle Doctrine." **Id.** at 61 (¶ 59). Because there was a reasonable possibility that the trial court would have granted the motion in consideration of the overwhelming weight of the evidence, this Court held "that the evidence preponderated so heavily against the verdict that a new trial was required to avoid sanctioning an unconscionable injustice." **Id.** at 62 (¶ 62).

¶54.  Ivory's attorney argues that the evidence "weighs more heavily in favor of acquittal based on misidentification" such that the "probability exists in Ivory's case to a sufficient degree to likewise undermine the confidence in the outcome of his case." We disagree.

¶55.  This Court recognizes that "[f]actual disputes are properly resolved by a jury and do not mandate a new trial." **Beasley v. State**, 136 So. 3d 393, 403 (Miss. 2014) (¶ 35) (citing

20

*Temple v. State*, 498 So. 2d 379, 382 (Miss. 1986)). Further, "[c]onflicting testimony does not evince overwhelming evidence; where the verdict turns on the credibility of conflicting testimony and the credibility of the witnesses it is the jury's duty to resolve the conflict." *Swanagan v. State*, 229 So. 3d 698, 705 (¶ 28) (Miss. 2017) (internal quotation marks omitted) (quoting *Ambrose v. State*, 133 So. 3d 786, 793 (Miss. 2013)).

¶56.    That the evidence that neither Slade nor Burks discerned a speech impediment, Ivory contends, combined with other ambiguities, shows that the verdicts were contrary to the weight of the evidence. But such evidence does not "support[] only one reasonable conclusion," namely, misidentification. Evidence of a sporadic speech impediment, while relevant to the physical characteristics of the suspect, is not so contrary to the overwhelming weight of the evidence—especially the evidence respecting identification of the assailant—to require the trial court to order a new trial.

¶57.    Both Slade and Burks testified that they had ample opportunity to observe the man who accosted them. Their initial descriptions of that man conformed to Ivory's physical characteristics and his clothing. The State also adduced evidence that both Slade and Burks immediately identified Ivory as the assailant in photograph lineups days after the incident. The lineups were extensive, and no objection regarding their use was raised. Slade and Burks did not vacillate in their testimony at trial that Ivory was the man who had robbed and kidnaped them on December 18, 2016. The totality of evidence was sufficient to support a finding by the jury that Ivory was the perpetrator. *See*, *e.g.*, *Shinn v. State*, 179 So. 3d 1006

(Miss. 2015) (witness identified defendant from photograph lineup and officers and recovered clothing from a search of defendant's residence matching robber's description); *White v. State*, 223 So. 3d 859 (Miss. Ct. App. 2017) (carjacking victims identified defendant in photo lineup and reaffirmed identification at trial). We find that the evidence presented was sufficient to support the convictions and does not preponderate against the verdicts.

¶58. Whatever conflicts in the evidence may have existed were resolved against Ivory by the jury. In reviewing the evidence presented in the light most favorable to the verdict, we find no reasonable probability that the trial judge would have granted a motion for a new trial. Although his trial counsel was deficient for failing to file a motion for new trial, Ivory was not prejudiced by that omission because the verdicts were not contrary to the overwhelming weight of the evidence. Accordingly, we deny Ivory's request for a new trial.

## CONCLUSION

¶59. We deny Ivory's request for a new trial, we reject his ineffective-assistance-of-counsel claim, and we affirm the judgment of the Monroe County Circuit Court.

¶60. **AFFIRMED.**

**RANDOLPH, C.J., KING, P.J., COLEMAN, MAXWELL, BEAM, CHAMBERLIN, ISHEE AND GRIFFIS, JJ., CONCUR.**